IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | Case No. 13-11697-RLM-11 |
| Mt. Laurel Lodging Associates, LLP, | ) | |
| | ) | |
| Debtor. | ) | |

**DEBTOR'S FIRST DAY MOTION FOR INTERIM AND FINAL
ORDERS AUTHORIZING DEBTOR TO USE CASH COLLATERAL
AND OTHER COLLATERAL AND GRANTING ADEQUATE
<u>PROTECTION AND TO SCHEDULE A FINAL HEARING</u>**

Mt. Laurel Lodging Associates, LLP ("Debtor"), by its putative counsel, files this motion (the "Motion") for interim and final orders pursuant to 11 U.S.C. §§ 361 and 363 authorizing Debtor to use cash collateral and other collateral and granting adequate protection and to schedule a final hearing on the Motion.[1]  In support of this Motion, Debtor respectfully represents as follows.

**CASH COLLATERAL SUMMARY**

1. By this Motion, Debtor seeks the entry of an Interim Cash Collateral Order authorizing it to use certain cash collateral of NRB (defined below), which generally consists of revenues generated at the Hilton Garden Inn hotel located at 4000 Atrium Way, Mt. Laurel, New Jersey (the "Hotel").  It is critical for Debtor to use such cash collateral to sustain sufficient working capital to finance its ongoing postpetition business operations until it confirms a plan of reorganization.  Absent the use of cash collateral, Debtor may be forced to close the Hotel, in which case its assets and its bankruptcy estate will be irreparably harmed to the detriment of not only Debtor, but also all of its creditors, and would result in significant job losses.

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Interim Cash Collateral Order.

67403-0024/LEGAL28078487.4

2.  Debtor proposes to use cash collateral on an interim basis for a period of approximately 25 days pursuant to the budget attached as **Exhibit 1** to the Interim Cash Collateral Order (the "Budget"), allowing Debtor to exceed any individual line item as long as the total does not exceed 110% of the Budget.  Debtor requests that the Court schedule a final hearing no earlier than 15 days following the date the Court enters an Interim Cash Collateral Order.  The proposed adequate protection Debtor expects to provide to NRB is the continued operation and maintenance of the Hotel, which will preserve the value of NRB's collateral.  Debtor is not providing NRB with any additional liens.

3.  Debtor proposes that its right to use the cash collateral shall expire on the earliest to occur of:  (a) November 29, 2013; (b) the entry by this Court of an order reversing, amending, supplementing, staying, vacating or otherwise modifying the terms of an Interim Cash Collateral Order; (c) the conversion of Debtor's bankruptcy case to a case under chapter 7 of the Bankruptcy Code; (d) the appointment of a trustee or examiner or other representative with expanded powers for Debtor; or (e) the occurrence of the effective date or consummation of a plan of reorganization (the first such occurrence being hereinafter referred to as the "Termination Event").  On and after the Termination Event, Debtor will immediately cease using any of the cash collateral; *provided however*, that Debtor reserves the right to seek Court authorization to continue to use such cash collateral.

## JURISDICTION

4.  The Bankruptcy Court exercises jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue of this bankruptcy case and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

67403-0024/LEGAL28078487.4

5. The statutory bases for the relief requested by this Motion are sections 361 and 363 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## BACKGROUND

6. On November 4, 2013 (the "Petition Date"), Debtor filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code.

7. This is a "First Day Motion" as that term is defined in United States Bankruptcy Court for the Southern District of Indiana Local Rule ("Local Rule") B-9013-3(f)(2).

8. Proposed counsel for Debtor has discussed the filing of this case with the chief courtroom deputy for the United States Bankruptcy Court for the Southern District of Indiana, and has advised the Office of the United States Trustee of this and other First Day Motions and/or 9006(c) requests, and provided copies of the same, in accordance with Local Rule B-9013-3(b).

**A.   The Hotel**

9. Debtor owns the Hotel, which is located at 4000 Atrium Way in Mt. Laurel, New Jersey, within 25 minutes of Philadelphia International Airport and downtown Philadelphia. Debtor built the Hotel from the ground up beginning in October, 2007 and the Hotel opened in October, 2011. Debtor employs approximately 34 employees at the Hotel. The Hotel has 140 guest rooms and meeting space for events with up to 60 guests. The Hotel offers its guests an indoor pool, fitness center, Wi-Fi internet service, room service, a select service restaurant (Great American Grill), a lounge (Pavilion Lounge), a bar (Garden Grille and Bar) and meeting space.

10. Debtor operates the Hotel as a Hilton Garden Inn pursuant to that certain Franchise License Agreement dated July 17, 2006 by and between Debtor and Hilton Inns, Inc.

("Franchisor"). The Hotel is managed by an affiliate of Debtor, Sun Development and Management Corporation ("Sun"), pursuant to a Management Agreement dated October 1, 2011 (the "Management Agreement") between Debtor and Sun. Debtor employs the Hotel's approximately 34 employees.

**B.     Pre-Petition Financing**

11. On October 25, 2007, Debtor obtained a loan (the "Loan") from The National Republic Bank of Chicago ("NRB") in the original principal amount of $15 million to build the Hotel. In connection with the Loan, Debtor executed, among other documents, (a) that certain Promissory Note (Fixed) dated as of October 25, 2007, (b) that certain Construction Loan Agreement dated as of October 25, 2007, (c) that certain Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated as of October 25, 2007, and (d) that certain Security Agreement dated as of October 25, 2007 (together with all other documents which evidence, secure, or relate to the Loan, the "Loan Documents"). From January, 2009 through October, 2011, the Loan Documents were amended six times. The Loan carried an initial interest rate of 8.25% and it matured on October 23, 2013.

12. In March, 2012, Sun entered into an Equipment Loan and Security Agreement (the "Equipment Loan Agreement") with Access Point Financial, Inc. ("Access Point"). Pursuant to the Equipment Loan Agreement, Access Point loaned Sun $5 million (the "Access Point Loan") relating to the furniture, fixtures and equipment for the Hotel and another hotel managed by Sun and owned by one of Debtor's affiliates, Ontario Lodging Associates, LLC ("Ontario").[2]

13. In May, 2012, the Equipment Loan Agreement was amended, whereby Debtor and Ontario agreed to be co-obligors on the Access Point Loan with Sun in the principal amounts

---

[2] Ontario also filed a chapter 11 petition in this Court on the Petition Date.

of $2,356,849.23 and $2,643,150.77, respectively.  At the same time, Access Point and NRB entered into an Intercreditor Agreement and Certificate, pursuant to which NRB agreed to subordinate its liens and claims to those of Access Point.

C.      **Events Leading to Chapter 11 Filing**

   1.      **Debtor's Ownership and Management**

14.     Debtor is owned by Bharat N. Patel ("Bharat") (50%), Nayna Patel (20%), Harshad Patel (20%) and Sun Family, LLC (10%).  Bharat's career in the hospitality industry dates back to 1989 with the purchase of a single hotel in Indianapolis.  Since then, Bharat has become one of the most prominent Asian Americans in the hotel industry in the United States as a hotel developer, owner and manager based in Indianapolis.  Bharat and entities he owns and/or controls have received numerous prestigious hospitality awards, including: Hilton Developer of the Year – 2009; Embassy Suites Developer of the Year – 2008; Homewood Suites Developer of the Year – 2007; Ernst and Young Entrepreneur of the Year – 2009 Midwest Finalist; Johnson Center for Entrepreneurship and Innovation, Growth 100 Award – 2001, 2004 and 2005; Choice Hotels Gold Award – 1995-98; IndUS Business Journal, Largest IndUS Hotel Management Companies – 2007-08[3]; and the Asian American Hotel Owners Association Excellence in Lodging Award – 2005.  Bharat has built, owns and manages premier national hotel brands such as Embassy Suites, Hilton Garden Inn, Homewood Suites, Hampton Inn & Suites, TownePlace Suites, SpringHill Suites, Fairfield Inn and Suites, Holiday Inn & Suites, Holiday Inn Express, Staybridge Suites, Candlewood Suites and Comfort Suites.  Bharat and entities under his control own approximately three dozen hotels throughout the United States.

---

[3] IndUS Business Journal is a business-to-business newspaper covering the Indian and South Asian business community in the United States.

5

### 2. The Economic Downturn

15. Within one year after Debtor obtained the Loan and began construction on the Hotel, the hospitality industry began its spiral into an economic downturn unlike any other the industry had ever experienced. On September 15, 2008, Lehman Brothers announced its bankruptcy filing and the Dow Jones closed down just over 500 points, which at the time was the largest single day drop since the days following the terrorist attacks on September 11, 2001. During the following month, it was reported nationally that executives of American International Group (AIG), spent over $440,000 on a corporate retreat less than 2 weeks after AIG had received an $85 billion loan from the Federal Reserve. This set off a fire storm of politicians railing against perceived excesses in corporate spending on travel and meetings. The political rhetoric and intense media scrutiny created what became widely known throughout the travel, tourism, hospitality and meeting planner industries as the "AIG effect," wherein corporations severely cut back their travel and meeting budgets for fear of negative publicity that would potentially follow any events that might have even the slightest appearance of frivolity. Among other things, hotels experienced a significant drop in occupancy and hotel values plummeted. It is with this backdrop that Debtor was attempting to construct the Hotel.

### 3. The National Republic Bank of Chicago

16. Based in Chicago, Illinois NRB is the largest Asian-American owned bank in the United States and is well-known in the Asian-American community, both in Chicago and around the country. The vast majority of NRB's clients are of Asian descent and approximately 90% of NRB's borrowers operate in the hospitality industry. NRB is owned and controlled by Hiren Patel ("Hiren," who is no relation to Bharat), who acquired NRB in 1984. Edward Fitzgerald ("Fitzgerald") serves as NRB's President. Bharat and his companies are NRB's largest client by

far, with outstanding loans totaling approximately $166 million in the aggregate, an astoundingly high percentage of NRB's outstanding loans.

17. When the economic downturn struck in 2008, many lenders understood the challenges facing their hospitality clients and readily restructured loans and reduced interest rates. On the other hand, NRB - through the actions of Hiren, Fitzgerald and others - seized this as an opportunity to take advantage of its Asian-American borrowers who placed their unfettered trust in the bank.

18. During 2008, Debtor and four of its affiliates had outstanding construction loans with NRB and all were in the process of building hotels. Bharat knew that Debtor and its affiliates could not continue satisfying construction costs and paying NRB 8.25% interest during a significant recession. Therefore, Bharat requested reduced interest rates to avoid having to cease construction on five new hotels. Hiren responded that he was trying to sell NRB and could not reduce interest rates or allow construction to stop because NRB could not have any unprofitable or stalled construction loans on its books. As an alternative, Hiren urged Bharat to continue construction and promised him that, notwithstanding the interest rate contained in loan documents, he would ensure that Debtor and its affiliates would be credited for the interest paid over Prime plus 1% when NRB was sold or the loans were refinanced.[4] However, Hiren had no intention of waiving NRB's right to the higher interest rate.

19. From the latter part of 2008 through August, 2013, Hiren and Fitzgerald induced Bharat to obtain additional new construction loans from NRB at above-market interest rates with the promise that, among other things, all interest would be credited at a later date. Because Debtor's and certain of its affiliates' hotels were either under construction or had just opened,

---

[4] Hiren assured Bharat that he would remain in charge of NRB if a sale was consummated; thus, he could then modify interest rates and credit Debtor's account.

they had a difficult time paying debt service to NRB on a monthly basis. To make sure that it continued to receive its above-market interest, NRB simply increased the principal on various loans so that its own additional loan proceeds could be used to satisfy its own monthly interest payments. When NRB apparently reached its legal lending limit for its existing loans, Hiren and/or Fitzgerald induced Bharat to obligate to NRB other entities he owned and/or controlled even though those entities received no consideration and NRB used "loan proceeds" for unaffiliated borrowers of NRB without Bharat's consent or knowledge.[5]

20. In addition to compelling Bharat to take the additional loan proceeds to keep NRB's above-market interest current, NRB insisted upon obtaining additional collateral in the form of full personal guarantees, pledges of ownership interests in Debtor's affiliates that were not NRB's borrowers and second mortgages on properties owned by Debtor's affiliates that were not NRB's borrowers, all with no consideration flowing to those entities. When Bharat expressed concern about granting such collateral, Hiren and Fitzgerald repeatedly assured him that NRB would not record any pledges or second mortgages, but rather NRB only needed to have the documents in NRB's files to demonstrate that NRB had sufficient collateral to secure all of its loans to Debtor and its affiliates. Throughout all this time, Hiren acted as a trusted advisor and fiduciary to his fellow Asian-American, Bharat.

21. Upon information and belief, NRB's manipulation of Bharat may have permitted Hiren to create profits for NRB that he could use to line his own pockets. NRB's curious "robust profits" were recently brought to light in a Crains Chicago Business article.[6] However, once NRB had sucked the equity out from all of its Asian-American borrowers, it apparently had to

---

[5] On September 30, 2013, Debtor's counsel made a written demand to NRB's counsel for the return of all Debtor's loan proceeds that were used by NRB to partially satisfy third-party loans. NRB's counsel has not responded to this demand.

[6] *See* http://www.chicagobusiness.com/article/20130921/ISSUE01/309219982/how-did-national-republic-bank-get-into-this-position.

report major losses, including the recent disclosure by Crains that NRB has capital of only $139 million to support $250 million in problem assets. *See id*. Even more troubling for NRB is the fact that, upon information and belief, the $250 million in problem assets may not include Bharat's $166 million of loans.

22. NRB's questionable banking practices prompted a government investigation, which, on August 31, 2013, resulted in the Comptroller of the Currency of the United States of America and NRB agreeing to a Consent Order, which, among other things, requires NRB to (a) decrease its concentrations and develop and adhere to a concentration risk management program, (b) develop plans to properly rate risk and recognize non-accruals, (c) develop individual work-out plans for troubled loans, and (d) hire a forensic auditor to investigate the accuracy of bank documents and books and records. Debtor is unaware whether NRB has complied with the Consent Order.

23. When it became clear that Debtor and its affiliates could not repay their loans in full, NRB refused to honor its promises to credit Debtor and its affiliates for the payment of unreasonably high interest rates for years. Instead, starting in late August, 2013, NRB recorded the second mortgages and other pledges that had been granted in reliance on NRB's promise that it would not record any such documents. Then, on October 11, 2013, NRB filed for foreclosure against Debtor in New Jersey and requested the emergency appointment of a receiver for the Hotel. The receivership hearing was scheduled for November 8, 2013 at 10:00 a.m. EST. Debtor has since presented NRB with a restructuring proposal but NRB refused to negotiate. Debtor filed for chapter 11 believing that it will afford it the best opportunity to restructure or refinance the Loan and stabilize the Hotel over future years, as well as litigate its substantial causes of action against NRB, Hiren and Fitzgerald.

9

**RELIEF REQUESTED**

24. By this Motion, Debtor requests entry of interim and final orders authorizing Debtor to:

    (a) use NRB's cash collateral relating to the Hotel's revenues (the "Cash Collateral"), pursuant to sections 361 and 363 of the Bankruptcy Code, and provide adequate protection to NRB's interest in the Cash Collateral resulting from its use; and

    (b) pursuant to Bankruptcy Rule 4001, schedule, no earlier than 15 days from the entry of the Interim Cash Collateral Order, a hearing (the "Final Hearing") for this Court to consider entry of a final order authorizing the use of Cash Collateral, as set forth in this Motion.

25. Without the use of the Cash Collateral, Debtor does not have sufficient available working capital to finance its ongoing postpetition business operations until it confirms a plan of reorganization. Debtor believes that its use of Cash Collateral will allow it to operate as a going concern until it confirms its plan of reorganization, which will maximize the value of the estate for all creditors. In the absence of immediate authorization to use Cash Collateral, Debtor could not continue to operate the Hotel, which would cause immediate and irreparable harm to its assets, its creditors and its bankruptcy estate. The use of such Cash Collateral is fair and reasonable and reflects Debtor's exercise of prudent business judgment consistent with its fiduciary duties. Further, Debtor believes that the proposed adequate protection for NRB, i.e., the continued operation and maintenance of the Hotel, will preserve the value of NRB's collateral.

**BASIS FOR RELIEF**

A.    **Use of Cash Collateral**

26. The revenues generated by the Hotel are subject to NRB's mortgage and security agreement and, as such, constitute Cash Collateral. Section 363(a) of the Bankruptcy Code

defines cash collateral as, among other things, "the proceeds, products, offspring, rents, or profits of property and the fees, charges, accounts or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties subject to a security interest as provided in section 552(b) of this title." 11 U.S.C. § 363(a). Section 552(b)(2) similarly provides, in pertinent part, that:

> [I]f the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to amounts paid as rents of such property or the fees, charges, accounts, or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties, then such security interest extends to such rents and such fees, charges, accounts, or other payments acquired by the estate after the commencement of the case to the extent provided in such security agreement . . .

11 U.S.C. § 552(b)(2).

27.     Debtor has a critical need for the immediate use of the Cash Collateral. Debtor needs the use of the Cash Collateral to continue to timely satisfy ongoing postpetition obligations. Without the immediate use of the Cash Collateral, Debtor will not be able to sustain its business during the postpetition period and may be forced to close its Hotel. Such a result would be disastrous to all of Debtor's creditors, including NRB.

28.     Therefore, Debtor requires use of the Cash Collateral to operate its business and to pay the Hotel's employees, vendors, taxes, insurance, and other ordinary course expenses, so that the Hotel can continue to generate revenue and maintain or increase its value.

**B.     Adequate Protection**

29.     Pursuant to section 363(c)(2) of the Bankruptcy Code, Debtor may not use the Cash Collateral without NRB's consent or Court approval. *See* 11 U.S.C. § 363(c)(2). Section

11

363(e) of the Bankruptcy Code provides that on request of an entity that has an interest in property to be used by Debtor, the Court shall prohibit or condition such use as is necessary to provide adequate protection of such interest.  *See* 11 U.S.C. § 363(e).

30. Pursuant to *United Sav. Association of Texas v. Timbers of Inwood Forest Associates, Ltd.,* 484 U.S. 365, 372 (1988), the interest in property entitled to adequate protection under section 363(e) is equal to the value of the collateral that is subject to the secured creditor's lien.  Accordingly, a debtor can provide adequate protection to an undersecured creditor by maintaining the value of the collateral.  *See, e.g., In re Addison Props. Ltd. P'ship*, 185 B.R. 766, 769 (Bankr. N.D. Ill. 1995) ("it is now established that 'adequate protection' is meant only to assure that a secured creditor does not suffer a decline in the value of its interest in the estate's property, rather than to compensate the creditor for the bankruptcy-imposed delay in enforcing its rights in that property.").

31. As adequate protection for NRB's interest in the Cash Collateral, Debtor proposes to use the Cash Collateral to pay the Hotel's operating expenses, including the Hotel's employees, postpetition vendors, insurance, taxes and other ordinary course expenses, as more specifically described in the Budget attached as **Exhibit 1** to the proposed Interim Cash Collateral Order, allowing Debtor to exceed any individual line item as long as the total does not exceed 110% of the Budget, *provided*, *however*, that if the Hotel's total cash receipts exceed the total cash receipts identified in the Budget by more than 10% for any given month contained within the Budget, Debtor is allowed to exceed the expenses set forth in the Budget by the additional percentage by which actual cash receipts exceed budgeted cash receipts for that month.  For example, if the Hotel's actual revenues exceed the Hotel's budgeted revenues by 15% in a given month, Debtor is allowed to exceed the expenses set forth in the Budget by 15%

for the applicable month. By so doing, Debtor anticipates that it will be able to maintain the Hotel—*i.e.,* NRB's collateral—and keep it from deteriorating or diminishing in value. Indeed, Debtor submits that expending the Cash Collateral on the Hotel itself can only preserve or increase the value of the Hotel and, thus, NRB's interest.

32. Debtor has not yet obtained an appraisal of the Hotel and thus, does not express an opinion of its current value. However, regardless of its value, NRB is not entitled to be paid postpetition interest on its claim. To the extent that NRB is undersecured, its claims do not accrue interest. *Timbers,* 484 U.S. at 372-73; *In re Fesco Plastics Corp.*, 996 F.2d 152, 155-56 (7th Cir. 1993). To the extent that NRB is oversecured and entitled to postpetition interest, such interest merely accrues on its claim and is not required to be paid during the pendency of this case. *Rake v. Wade*, 508 U.S. 464, 471 (1993) ("Under § 506(b) the holder of an oversecured claim is allowed interest on his claim to the extent of the value of the collateral. Section 506(b) 'directs that postpetition interest be paid on all oversecured claims,' . . . and, as the parties acknowledge, such interest accrues as part of the allowed claim from the petition date until the confirmation or effective date of the plan."); *Fla. Partners Corp. v. Southeast Co. (In re Southeast Co.)*, 868 F.2d 335, 340 (9th Cir. 1989) ("Nothing in section 506(b) requires the current payment of fee awards."); *Presque Isle Apartments, L.P. v. Landmark Sav. Assocs. (In re Presque Isle Apartments, L.P.)*, 112 B.R. 744, 749 (Bankr. W.D. Pa. 1990) ("§ 506(b) provides only for the allowance of such charges. It does not require current payment of such amounts."); 3 Collier on Bankruptcy ¶ 506.04[4] at 506–112 (16th ed. 2012) ("[S]ection 506(b) provides only for the *allowance* of postpetition interest, fees, costs and charges as part of a secured claim. It does not require the current *payment* of these amounts.") (emphasis in original). As a result, Debtor is not required and does not propose to make any postpetition interest payments to NRB.

33. Debtor requests that the Court find that the foregoing adequate protection to be granted to NRB is reasonable and sufficient to protect its interests.

**C.      Interim Approval**

34. Bankruptcy Rule 4001(b) governs the procedures for the use of cash collateral, and provides, in relevant part:

> The court may commence a final hearing on a motion for authorization to use cash collateral no earlier than 15 days after service of the motion. If the motion so requests, the court may conduct a preliminary hearing before such 15 day period expires, but the court may authorize the use of only that amount of cash collateral as is necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

Fed. R. Bank. P. 4001(b)(2).

35. Accordingly, the Court is empowered to conduct a preliminary expedited hearing on the Motion and authorize the interim use of Cash Collateral to the extent necessary to avoid immediate and irreparable harm to Debtor's estate. Debtor seeks entry of the Interim Cash Collateral Order to avoid immediate and irreparable harm to its estate, its assets and its creditors. This relief will enable Debtor to operate the Hotel in the ordinary course and to pay necessary expenses pending a final hearing on the Motion. Pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2, the Court is authorized to grant the relief requested by this Motion.

36. Immediate relief is warranted under these circumstances. Absent such relief, Debtor may not be able to obtain goods and services needed to operate its Hotel in the ordinary course of business. The Hotel receives delivery of necessary goods and services on an almost daily basis and it is critical that Debtor be given the right to use its cash without interruption because some of Debtor's vendors may no longer be willing to extend postpetition credit to

Debtor and may require cash in advance or on delivery. As such, Debtor cannot afford to be without use of its cash for more than a few days.

## COMPLIANCE WITH RULE 4001 AND LOCAL RULE 4001-2

37.     Local Rule 4001-2, which governs cash collateral motions filed within this Judicial District, requires Debtor to highlight certain provisions contained in the Interim Cash Collateral Order. *See* Local Rule 4001-2(b). Debtor submits that none of the provisions contained in Local Rule 4001-2(b) are included in its proposed Interim Cash Collateral Order.

38.     Bankruptcy Rule 4001(b) provides that if a cash collateral motion exceeds five pages, it must begin with a concise statement of the relief requested, which summarizes and identifies the location of certain material provisions in the applicable documents. *See* Bankruptcy Rule 4001(b)(1)(B). Debtor asserts that it has complied with both Bankruptcy Rule 4001(b) and Local Rule 4001-2 by providing the Cash Collateral Summary at the beginning of this Motion.

## NOTICE

39.     Notice of this Motion has been given to: (a) the United States Trustee; (b) NRB; (c) Debtor's 20 largest unsecured creditors; (d) Access Point; (e) the Internal Revenue Service; and (f) any party that has appeared and/or requested notice by telecopy, electronic mail, overnight delivery service or hand delivery. Debtor submits that, under the circumstances, no further notice of the hearing is necessary and requests that any further notice be dispensed with and waived.

40.     Debtor further requests that the Court schedule a final hearing on the use of Cash Collateral and authorize Debtor to serve a copy of the signed Interim Cash Collateral Order, which fixes the time and date for the final hearing and the date for filing of objections, by first-

15

class mail upon: (a) the United States Trustee; (b) NRB; (c) Debtor's 20 largest unsecured creditors; (d) Access Point; and (e) any party who filed a request for notices in this chapter 11 case pursuant to Bankruptcy Rule 2002 prior to the date of service of the Interim Cash Collateral Order. Debtor requests that the Court consider such notice of the final hearing to be sufficient notice under Bankruptcy Rule 4001 and Local Rule 4001-2.

(*remainder of page intentionally left blank*)

WHEREFORE, Debtor respectfully requests that the Court enter an order granting the relief requested herein and granting such other relief as is just and proper.


Dated: November 4, 2013                              **MT. LAUREL LODGING ASSOCIATES, LLP**

By: /s/ Michael P. O'Neil
Michael P. O'Neil
TAFT STETTINIUS & HOLLISTER LLP
One Indiana Square, Suite 3500
Indianapolis, Indiana 46204-2023
Telephone: (317) 713-3500
Facsimile: (317) 713-3699
moneil@taftlaw.com

-and-

David M. Neff
Brian A. Audette
David J. Gold
PERKINS COIE LLP
131 S. Dearborn Street, Suite 1700
Chicago, Illinois 60603-5559
Telephone: (312) 324-8400
Facsimile: (312) 324-9400
dneff@perkinscoie.com
baudette@perkinscoie.com
dgold@perkinscoie.com

*Proposed Attorneys for Debtor*

# **EXHIBIT 1**

67403-0024/LEGAL28078487.4

## HILTON GARDEN INN MT LAUREL, NJ

| Cash Budget | Nov., 2013 | Dec., 2013 |
|---|---:|---:|
| **Cash Receipts** | | |
| Gross Revenues | 360,975 | 295,975 |
| Occupancy/Sales Tax Collected | 50,537 | 41,437 |
| **Total Cash Receipts** | **411,512** | **337,412** |
| **Cash Disbursements** | | |
| Gross Payroll and Related Expense | 86,400 | 81,000 |
| Leases | 750 | 750 |
| Insurance General | 5,000 | - |
| Workers Compensation Insurance Audit | 3,013 | 3,013 |
| Credit Card Commission | 10,107 | 8,287 |
| Room Department Operating Expenses | 24,358 | 20,126 |
| F & B Operating Expenses | 17,200 | 15,000 |
| Administrative and General | 5,900 | 5,300 |
| Sales and Marketing | 1,250 | 1,250 |
| Property Operations & Maintenance | 7,100 | 7,000 |
| Utilities | 21,000 | 20,000 |
| Telecommunication and Other Expenses | 3,900 | 3,700 |
| Franchise Fees | - | 34,333 |
| US Trustee Fees | Pd Quarterly | Pd Quarterly |
| Property Tax | - | - |
| Management & Accounting Fees | - | 16,224 |
| Sub Total | 185,978 | 215,983 |
| Occupancy / Sales Tax | 50,537 | 41,437 |
| Access Point | 40,298 | 40,298 |
| Capital | - | - |
| **Total Cash Disbursements** | **276,813** | **297,718** |
| **Net Change in Cash from Operations** | **$ 134,699** | **$ 39,694** |