**SO ORDERED: April 18, 2014.**




**Robyn L. Moberly**
**United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| MT. LAUREL LODGING ASSOCIATES, LLP | ) | CASE NO. 13-11697-RLM-11 |
| | ) | |
| Debtor | ) | |

**MEMORANDUM OPINION[1] ON VALUATION OF HOTEL**

The Debtor filed its chapter 11 case on November 4, 2013. The National Republic Bank of Chicago (the "NRB") is its primary lender and has filed a secured claim in the amount of $22,794,584.05. The Debtor has moved this Court for a hearing to determine the value of NRB's secured claim. [2] The Debtor has an extended exclusivity period up to June 2, 2014 in which to file its plan.

The Debtor owns and operates a Hilton Garden Inn in Mount Laurel, New Jersey (the "Hotel"). Mount Laurel is a suburb of Philadelphia and has about 41,000 residents.

[1] This constitutes the Court's findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052.
[2] The National Republic Bank of Chicago holds a mortgage in the hotel operated by the Debtor as well as a security interest in other collateral of the Debtor. This opinion determines only the value of the hotel.

The Hotel is a "select service" lodging facility[3] and has 140 guest rooms. The Hotel is located 15 minutes from the center of Philadelphia. It opened in 2011 and is in excellent condition. Its clientele is a mix of corporate, group (e.g. weddings, class reunions) and leisure (vacationers) guests which comprise the three major segments of the hotel industry. Fort Dix is nearby, generating good government demand. Sun Development and Management Corporation ("Sun") manages the Hotel and performs all of the Debtor's accounting services offsite for which it receives a commission of 4% of revenues generated for management services and an additional ½% for accounting services. The experts that appraised the Hotel were The Pinnacle Advisory Group ("Pinnacle") for the Debtor and U.S. Hotel Appraisals ("USHA") for NRB. Both sets of experts did "self contained" thorough and complete appraisals. Both sets of appraisals concluded that property's highest and best use would be for it to continue operating as a hotel. The Hotel is a revenue generating property and potential buyers or investors would be buying it for the future revenues it will generate rather than the brick and mortar from which it is built. Both sets of appraisers used the income capitalization approach as the primary valuation approach and used the sales comparison approach as a secondary approach by which to validate their conclusions reached under the income capitalization approach.

***The Income Capitalization Approach***

The income capitalization approach includes both the "direct capitalization" method and the "yield capitalization" method, also known as the "discounted cash flow" method. *In re Hotel Associates, LLC*, 340 B.R. 554, 557 (Bankr. D. S.C. 2006). Both the direct capitalization and the discounted cash flow methods involve forecasting future net operating income ("NOI"). Computation of NOI for a hotel is complicated. It is determined by taking projected gross revenues and backing out projected operating and fixed expenses. Gross revenues are largely driven by the property's rooms revenues. Rooms revenues are determined by multiplying the average daily room rate ("ADR") by the percentage of occupied rooms which results in "revenue per available room" or

[3] The hospitality industry categorizes hotels as "full service", "select service" or "limited service". A "full service" hotel has a restaurant, room service and bellhop service. A "select service" does not have bellhop service but may have kitchen facilities or a restaurant from which guest may order room service. A "limited service" hotel has neither a restaurant, room service nor bellhop services.

"RevPAR". For example, historical data presented in Pinnacle's appraisal showed that the average daily room rate for the Hotel in 2012 was $114.91 and its overall occupancy rate for 2012 was 66.1%, resulting in a RevPar (rounded up to the nearest penny) of $75.96 (114.91 x .661). The RevPar was then multiplied by the number of rooms available (140) for each day of the 2012 year that the hotel was open for business (366) to arrive at the rooms revenue of $3,892,204 for 2012 ($75.96 x 140 x 366 = $3,892,109, or, $3,892,204 after slight adjustments). Additional revenue to be added to rooms revenues includes revenue from food, beverages, meeting space, fees received for telecommunication services offered, and other minor sources of revenue.

The fixed and operating expenses are then subtracted from the gross revenues. Room expenses alone include all costs associated with operating the rooms, including front office and housekeeping payroll, laundry, cleaning supplies, toiletries provided to guests, and any refunds or discounts. Other operating expenses include expense related to food and beverage, hotel administration, sales and marketing, property maintenance and utilities. Fixed expenses include property taxes, insurance and reserves for replacement of furnishings, fixtures and equipment ("FF & E"). Gross revenues less fixed and operating expenses results in NOI.

***The Direct Capitalization Method under the Income Capitalization Approach***

The direct capitalization method uses a capitalization rate ("cap rate") which is the rate of return that the income producing property can be expected to achieve. See, *In re 210 Ludlow Street Corp*., 455 B.R. 443, 446 (Bankr. W. D. Pa. 2011). The cap rate is derived from market data and represents the perceived risk of investing in the subject property. The higher the perceived risk, the higher the cap rate. *Hotel Associates*, 340 B.R. at 557. Under the "direct capitalization" method, the projected NOI for the year is divided by the cap rate to determine the value of the subject property. Using the cap rate as the denominator, the higher the cap rate/ denominator, the lower the property's value. Pinnacle did not use the direct capitalization method in its appraisal because it asserted that the direct capitalization method is not as suitable for properties still in "ramp up" mode that have not yet stabilized (as the Hotel here). USHA applied the direct capitalization method and used projected 2014 NOI of

$1,606,000 and a cap rate of 7% to arrive at a value of $22,942,857 ($1,606,000 divided by .007), and rounded to $22,900,000.

***The Discounted Cash Flow Method under the Income Capitalization Approach***

Both Pinnacle and USHA used the discounted cash flow method and it is that method upon which their valuations are primarily based. The discounted cash flow method uses a "discount rate" or a discount factor, which, like the cap rate, takes into account anticipated return on investment and the risks associated with the investment. It, too, is derived from market data. The discount rate is applied to estimated cash flow over the "holding" period in which the investor is expected to hold the property. The value of the property is present value of the discounted cash flow over the holding period. Both Pinnacle and USHA included the discounted cash flow method in their appraisals. Both used the typical hotel holding period of ten (10) years.

Because a potential investor would also be interested in what the property would bring in a sale after the holding period, both Pinnacle and USHA included a "reversion" analysis with the discounted cash flow method. The "reversion" analysis presupposes that the property will be sold immediately after the expiration of the holding period. The estimated cash flow from the year immediately following the holding period (here, the 11th year) is divided by an "end" or a "terminal" cap rate resulting in an estimated sales price of the property in the 11th year. Again, the "end" or "terminal" cap rate is derived from market data. Costs of sale or transaction costs, are subtracted from the estimated sales price to arrive at the amount of reversion or net sales proceeds to be realized in the 11th year. Both Pinnacle and USHA estimated the costs of sale at 2% of the estimated sales price in their reversion analysis.

With all these "moving parts" contributing to the final product, the appraisal's integrity is dependent upon how credible the assumptions regarding revenue, expenses and NOI are, as well as the market research and analysis performed in arriving at cap rates, discount rates and end or terminal discount rates. See, *Id*., ("Since NOI and the selected cap rate are estimated, assumptions with respect to the forecasted revenues and expenses for the property and the selected cap rate must be closely examined

because each factor has a significant impact on the final value assessed under the 'income capitalization approach' ").

***The Debtor's Appraisal (Pinnacle)***

Pinnacle preliminarily requested from the Debtor income and expense statements, budgets, marketing plans, Smith Travel Research reports (also called "STR Reports" or "HOST" reports)[4] , copies of service, management, franchise and lease agreements, property tax bills, architectural drawings, past appraisals and environmental reports as well as other information pertinent to the Hotel's operations. Rachel Roginsky (Roginsky") and Jonathan Jaeger ("Jaeger") of Pinnacle worked on the Hotel appraisal. Jaeger, an MAI, did the physical onsite inspection and spoke with the Hotel's general management, and director of sales. Jaeger had full access to the "back of the house" as well as the "front of the house". [5] Roginsky followed up with a second tour of the Hotel, likewise with full access. Roginsky also followed up with additional interviews with onsite management and Sun.

To determine revenues and expenses, Roginsky and Jaeger used the Debtor's 2011 and 2012 financials and 2013 financials through October as well as the Debtor's 2014 operating budget. They also used STR's 2013 HOST report for 2012 data. Their interview with the tax assessor revealed that property taxes would be increased by 20% instead of by 3% as originally forecasted by management. They projected that the Hotel's occupancy rate would stabilize in 2016 at 75%, which is above the market rate of 65%. They projected that RevPAR would reach $100.90 in 2018. Although the Hotel was in excellent condition, they projected $200,000 for replacement reserves in 2014 which increased incrementally each year throughout the 10 year holding period. They estimated that NOI for the 10th and final year of the holding period would be $2,064,000.

To determine discount rate, they relied upon various hotel industry data and investor surveys as well as recent sales of hotels although not all of these hotels were comparable to the Hotel in location or level of service. The positive factors noted were

---

[4] Smith Travel Research is a "highly regarded and widely used resource for appraising hotels". *In re Miami Beach Hotel Investors, LLC*, 304 B.R. 532, 535 (Bankr. S. D. Fla. 2004).

[5] "Front of the house" access includes those areas normally accessible to hotel guests, such as the hotel common areas, individual rooms and banquet, conference and business facilities. "Back of the house" access refers to those areas typically not open to hotels guests, such as the kitchen, mechanical and electrical rooms, storage rooms and roof access.

that the Hotel was in excellent condition and easily accessible by highway. Mount Laurel is a desirable suburban market and the Hotel was the only Hilton Garden Inn brand in the local market. The negative factors noted were that current market ADR (average daily rates) was still below what it had been in the past. There is very little weekend business. No new hotels were slated to open in Mount Laurel, but two new hotels were to open in the market located six (6) miles south of the Hotel. Based on these factors, Pinnacle selected a discount rate of 10.5% . Dividing the NOI ($2,064,000) by the discount rate (.105) resulted in a discounted cash flow value, after slight adjustments, of $19,604,106. They concluded that the Hotel's "as is" value, as of November 1, 2013, was $19,600,000, or $140,000 per room ($19,600,000 divided by 140).

***NRB's Appraisal (USHA)***

USHA was instructed not to talk to Hotel management and did not request financial and operating data from the Debtor . Chelsey Leffet ("Leffet"), a project manager at USHA, did the field work for the appraisal and inspected the Hotel. She had done the field work and inspection for a previous appraisal of the Hotel in April, 2013. At that time, she interviewed the Hotel's general manager as part of her preparation of that appraisal and was granted full access of the Hotel. For the current appraisal, she had only "front of the house" access.

Jerod Byrd ("Byrd") a senior vice president of USHA, also worked on the April 2013 and the current appraisals. Both Leffet and Byrd relied on the Hotel's 2013 financials up through October that NRB had given them. Having conducted an appraisal of the same property earlier in 2013, they already had the Hotel's 2011 and 2012 financials. They also relied on operating statements of comparable hotels and other market information, including the STR reports, to project revenue and expenses. They projected that the Hotel's occupancy rate would stabilize in 2015 at 76%. They projected that RevPAR would reach $103.24 in 2017. They were not aware of the 17% jump in the property tax assessment and projected only a 2½% jump from 2013-2014. They also projected a 3% management fee instead of the current 4% management fee, although Byrd thought that the 4% fee was excessive and that 3% fee would be competitive. They projected $206,000 for replacement reserves in 2014 and, like

Pinnacle's projection, that reserve increased incrementally throughout the ten year holding period. They estimated that the NOI for the 10th and final year of the holding period would be $2,297,000, only $233,000 more than Pinnacle's projected NOI.

To determine the discount rate, USHA , too, relied on hotel industry data and investor surveys. Byrd was more optimistic about the Hotel's competitive position in the local market in that it is in a highly desirable location and a high quality select service facility. He testified that demand was outpacing supply growth in the market and did not mention the two new hotels set to open six miles away as negative factors. The STR Reports pulled by Byrd indicated that hotels many nights were reaching at or above 80% occupancy. Byrd testified that the typical investor in the Hotel would be an institutional investor or a real estate investment trust (REIT) that want to diversify their portfolios and would be willing to pay more for the Hotel compared to a local operator for whom the Hotel would be too expensive. Byrd testified that a bid of $19,600,000 (Pinnacle's valuation) for the Hotel would be "blown out of the water", that such a bid was "not even in the ballpark" and that investors would bid "much higher" than that amount. Based on these factors, USHA selected a discount rate of 10%. Dividing the NOI ($2,297,000) by the discount rate (.10) resulted in a discounted cash flow value of $22,970,000 and, after adjustments, $23,100,000. Byrd and Leaflet concluded that the Hotel's "as is" value, as of December 1, 2013, was $23,100,000 or $165,000 per room ($23,100,000 divided by 140).

Both Pinnacle and USHA did a reversion analysis to buttress the valuations they reached under their respective discounted cash flow analyses . Pinnacle projected that the 11th year NOI would be $2,125,000 and chose a 8.5% terminal cap rate resulting in an estimated sales price of $25,000,000 in year 11 ($2,125,000 divided by .085). USHA projected that 11th year NOI would be $2,366,000 and chose an 8% terminal cap rate resulting in an estimated sales price of $29,575,000 ($2,366,000 divided by .08). Both Pinnacle and USHA estimated that costs of sale would be 2% of the estimated sales price. Backing out that 2% from their respective estimated sales figures, the "amount of reversion" or the proceeds of sale for Pinnacle and USHA are $24,500,000 and $28,983,000 respectively. This "amount of reversion" represents the net sales proceeds realized by an investor who bought the Hotel as of the date of the appraisals, held the

Hotel for 10 years and sold it in the 11th year. These reversion amounts are not determinative of value and both Pinnacle and USHA stand on the valuations determined under the discounted cash flow analysis. But the reversion amounts serve as a further check on those values.

Both the Pinnacle and USHA appraisals discussed the comparable sales method of valuation. Pinnacle conclude it was inapplicable to valuation of the Hotel and USHA concluded that the Hotel was worth $23,100,000 under this sales method. Again, the only purpose of applying such a valuation method was to back up the conclusions reached under the discounted cash flow analysis.

***Opinion of the Owner***

Bharat Patel ("Patel") is the Debtor's general partner and 50% owner. Patel believed that the Hotel had almost reached its potential for NOI and that the Hotel would not meet its January and February 2014 budget. Doug Marks is employed by Sun and testified that the revenues forecast for January 2014 had to be adjusted downward. Patel testified that the Hotel was worth "at most" $19,000,000.

Both sets of appraisals were thorough and complete. Both sets of the professionals that compiled the appraisals were qualified. The Court however finds that USHA's failure to talk to the Hotel's management, failure to request updated financial and operating data from the Debtor and failure to talk to Sun, as well as its limited access to the Hotel during its inspection made the assumptions upon which USHA relied for revenue, expenses and discount rates less credible. USHA underestimated revenue by underestimating property taxes and management fees. USHA has a good handle on the local market in general but not on this Hotel in particular, given its marching orders not to talk to management. USHA was overly optimistic in projected demand and the "robust" nature of the local market. Byrd, when pressed on cross examination, acknowledged that no new hotel had opened within the last two years and that most of the current supply entered the market between 2007 and 2009. NRB's counsel made much of a letter of intent wherein Navica Capital Group Phase III ("Navica") expressed an intent to purchase 50% of the equity in the 7 hotel consortium , of which the Hotel is one, for $123,000,000. Patel testified that the Navica offer was "absolutely not" reflective of fair market value and that the Hotel and its six other

counterparts have been shopped around to five different companies in the last 90 days but that those companies were awaiting 2013 year end financials. It appears that even NRB's appraiser, USHA, did not take this letter of intent into account in arriving at its conclusions of value. The Navica offer involves the sale of not only seven hotels, including this Hotel, but also the equity ownership and the intangibles attendant to equity ownership such as management and voting rights. The Navica offer, as it stands, is too speculative and not determinative of the value of this Hotel.

***Conclusion***

The Court finds that the assumptions upon which Pinnacle's appraisal was based were more credible and therefore finds that the value of the Hotel is $19,600,000.

# # #

Distribution:

David M. Neff/ Brian A. Audette/ David J. Gold/ Andrew T. Kight/ Michael P. O'Neil , Attorneys for the Debtor
Ariel Weissberg/ James P. Moloy/ James E. Carlberg, Attorneys for National Republic Bank of Chicago
United States Trustee